**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**WAYNE GOINS**                                                              **PLAINTIFF**

**v.**                          **CASE NO. 5:21-cv-5173-PKH**

**UNITED STATES OF AMERICA**                                              **DEFENDANT**

---

### COMPLAINT

---

COMES NOW, the Plaintiff Wayne Goins, by and through his undersigned counsel, and states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      At all relevant times herein, Wayne Goins was a resident of the State of Missouri, residing in Shell Knob, Barry County, Missouri and Mt. Vernon, Lawrence County, Missouri.

2.      The Veterans Health Care System of the Ozarks, also known as the Fayetteville VA Medical Center (hereinafter referred to as "Fayetteville VA"), is operated by the Veterans Health Administration of the United States Department of Veterans Affairs (hereinafter referred to as "VHA"), a department within the executive branch of the United States government.

3.      The Fayetteville VA operates as a medical center that provides veterans with inpatient and outpatient medical care, including primary care, mental health care, surgical, dental, optometric, chiropractic, preventive health, non-institutional extended care, medical devices, and medical-related incidentals for veterans in twenty-three counties in Northwest Arkansas, Southwest Missouri, and Eastern Oklahoma.

4.      The Fayetteville VA is located at 1100 North College Avenue in Fayetteville, Arkansas, within the territorial jurisdiction of the Western District of Arkansas, Fayetteville Division.

5.      Wayne Goins served in the U.S. Army and received numerous commendations including the National Defense Service Medal, Vietnam Service Medal, and Vietnam Campaign Medal.  By virtue of his service in the United States military, Mr. Goins was eligible to and did receive medical care through the United States Department of Veterans Affairs.

6.      This is an action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* against the United States of America.  Mr. Goins' personal injuries were proximately caused by the negligence, medical malpractice, wrongful acts and/or omissions of employees of the Fayetteville VA while acting in the course and scope of their employment.

7.      This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346(b).

8.      Venue is proper herein pursuant to 28 U.S.C. § 1402 because this is a civil action involving claims against the United States, and the acts and omissions giving rise to the claim occurred in the Western District of Arkansas.

9.      Additionally, at all times referred to herein, Defendant, its agencies, employees, and agents were acting under the color of state and federal law, statutes, ordinances, regulations, policies, customs, practices, and usages of the United States of America, pursuant to their authority thereunder.

## FACTUAL ALLEGATIONS

10.      Wayne Goins was a patient at the Fayetteville VA Hospital in Fayetteville, Arkansas.   On or about June 13, 2017, Mr. Goins underwent a right lung biopsy.  Pathology

materials related to the biopsy were sent to Dr. Robert Morris Levy ("Dr. Levy") at the Fayetteville

VA for examination and diagnosis.

11.     Dr. Levy was a board-certified anatomic and clinical pathologist and a board-certified hemapathologist.  Dr. Levy was issued a medical license by the Mississippi State Board of Medical Licensure in 1997 and, at various times, also held medical licenses in California, Florida, and Louisiana.

12.     In September 2005, the Fayetteville VA hired Dr. Levy as a *locum tendens* (temporary) pathologist.  At the time the Fayetteville VA hired Dr. Levy, Dr. Levy disclosed on his Declaration for Federal Employment a 1996 conviction for driving under the influence of alcohol.  *See* Office of Inspector General, *Pathology Oversight Failures at the Veterans Health Care System of the Ozarks in Fayetteville Arkansas*, at p. 8 (June 2, 2021) [hereinafter referred to as "OIG Report"] (attached hereto as **Exhibit "A"**).

13.     One month later, on October 16, 2005, the Fayetteville VA transitioned Dr. Levy to a full-time position as Chief of Pathology and Laboratory Medicine Services, subject to a two-year probationary period.  In the month between Dr. Levy's hiring as *locum tendens* and becoming Chief of Pathology and Laboratory Medicine Services, he reviewed 161 cases, resulting in nine level 2 diagnostic errors (5.59 percent).  Level 2 diagnostic errors are those in which a reviewer disagreed in the patient's diagnosis with minimal or no potential negative impact on patient care. An error rate above 0.7 percent is supposed to trigger a review of a VHA pathologist's practice. *See* OIG Report, at 38, footnote 107 ("Guidance from the VA path and lab program suggested an error rate exceeding 0.7 percent be viewed with concern").

14.     Dr. Levy's duties as Service Chief of Pathology and Laboratory Medicine Services at the Fayetteville VA included, but were not limited to, rendering diagnoses after examining fluid

and tissue samples obtained from Fayetteville VA patients; entering information into patients' medical records; assisting radiologists, surgeons, and others during needle biopsies; ensuring that quality standards were maintained for anatomical and clinic laboratory studies; and reporting errors that occurred at the Fayetteville VA pathology laboratory.  Dr. Levy also chaired the tumor board and served on various oversight boards and medical committees at the Fayetteville VA.  He was responsible for ensuring the compliance of the pathology department with the protocols and procedures of national laboratory and hospital accreditation agencies.

15.     Doctors and other medical providers at the Fayetteville VA reasonably relied upon the accuracy of the diagnoses made by Dr. Levy and the integrity of the information he entered in patients' medical records which largely influenced decisions about the course of medical treatment for Fayetteville VA patients.

16.     During a span of approximately two-and-one-half months, from mid-October of 2005 to the end of 2005, Dr. Levy reviewed 481 cases, resulting in 43 level 2 and level 3 diagnostic errors (8.94 percent).  Level 3 diagnostic errors are those in which there is a "major discrepancy in diagnosis that could possibly or potentially lead to complications or damage in [the patient's] health care."  *See* Transcript of Sentencing Hearing at 42:5-9, United States v. Robert Morris Levy, No. 5:19-CR-50059 (W.D. Ark. Jan. 21-22, 2021) [hereinafter referred to as "Sentencing Transcript"] (attached hereto as **"Exhibit B"**).

17.     During Dr. Levy's employment at the Fayetteville VA, Dr. Levy abused drugs and alcohol, being regularly intoxicated while providing medical services to VA patients in the course and scope of his employment.  Dr. Levy admitted to OIG investigators that he had been an alcoholic for 30 years and purchased a substance, 2-methyl-2-butanol (2M-2B), online that could

4

be ingested, was similar to alcohol but more potent, and was not detectable using routine drug and alcohol testing methods.  OIG Report, at 1.

18.     Oftentimes, while under the influence of drugs and alcohol in the course and scope of Dr. Levy's employment with the Fayetteville VA, Dr. Levy exhibited obvious symptoms of inebriation that were readily apparent to those around him, including fellow employees at the Fayetteville VA.  In fact, Special Agent Kris Raper, Department of Veterans Affairs, Office of Inspector General, testified during Dr. Levy's criminal sentencing hearing that Fayetteville VA employees suspected Dr. Levy of being intoxicated "on the job."  *See* Sentencing Transcript, at 96:12-20.  Agent Raper further testified that witnesses reported seeing Dr. Levy drinking in his car in the Fayetteville VA parking lot, "smelling like alcohol," and finding a cup containing alcohol next to a microscope.  Sentencing Transcript, at 97:22-98:1; 100:4-9.

19.     It was also documented that staff reported Dr. Levy being "abrupt, loud, slurring his words, and difficult to understand" while reviewing patient biopsy materials and presented to work on more than one occasion with red, glassy eyes.  OIG Report, at 26.  Further, in a 2015 interview regarding Dr. Levy, several staff members reported smelling the "odor of alcohol approximately weekly or monthly for at least seven years" of Dr. Levy's employment at the Fayetteville VA.  *See* OIG Report, at 19.

20.     Employees indicated that they observed Dr. Levy's impaired behavior but often hesitated reporting because they were told "whistleblowers were fired," they felt belittled after reporting, they were worried about reprisal, and they thought others were reporting the issue instead.  *See* OIG Report, at 47.

21.     Dr. Levy also maintained a high error rate throughout his employment at the Fayetteville VA.  From 2006 to 2007, Dr. Levy reviewed 5,601 cases, resulting in 489 level 2 and

level 3 diagnostic errors (8.73 percent).  Dr. Levy was the only pathologist at the facility from 2005 to 2007, and his performance was not evaluated by providers with comparable training and privileges in pathology.  *See* OIG Report, at 8-10.  Consequentially, between 2005 and 2007, facility leaders identified no practice concerns.

22.     The Fayetteville VA hired a second pathologist in 2008, Dr. Paul Hendrycy – a subordinate to Dr. Levy – who expressed concerns about disagreeing with Dr. Levy because Dr. Levy evaluated Dr. Hendrycy's performance.  *See* OIG Report, at 13.  From 2008 to 2011, Dr. Levy reviewed 10,898 cases, resulting in 1,000 level 2 and level 3 diagnostic errors (9.18 percent). Despite the increasing error rate, the Fayetteville VA continued approving Dr. Levy's privileges.

23.     From 2012 to 2013, Dr. Levy reviewed 4,425 cases, resulting in 494 level 2 and level 3 diagnostic errors (11.16 percent).  Still, evaluations of Dr. Levy by the Fayetteville VA did not reveal concerns during the two-year period.

24.     On or about March 2014, the Fayetteville VA Chief of Staff, Dr. Mark Worley, met with Dr. Levy after receiving reports that Dr. Levy's breath smelled of alcohol while at work.  Dr. Levy claimed that the smell was from a juice mixture he drank to lose weight, and the explanation was accepted by Dr. Worley who took no further investigative actions.  *See* OIG Report, at 17-18.

25.     A look-back review for the cases reviewed by Dr. Levy in 2014 identified 291 level 2 and 3 diagnostic errors, out of 2,665 cases reviewed that year, resulting in a 10.92 percent error rate.

26.     In September and October 2015, staff again reported on two occasions that Dr. Levy smelled of alcohol, exhibited hand tremors, and displayed red eyes at work.  Dr. Levy consented to a blood alcohol content test, but the Fayetteville VA did not administer one.  Further investigation was not conducted.  *See* OIG Report, at 19-21.

27.     On March 22, 2016, Dr. Levy exhibited signs of impairment while reviewing pathology slides during a liver biopsy.  Dr. Worley reported that Dr. Levy was abrupt, loud, slurring his words, and difficult to understand.  A blood alcohol content test revealed that Dr. Levy's blood alcohol content at work was 397.6 mg/dL.  Dr. Worley noted that the blood alcohol content was "high enough to induce a coma in a person without tolerance to alcohol" and that it was "consistent with a long-term user of alcohol who had built up tolerance to its effects."  OIG Report, at 27.

28.     Following the results of the blood alcohol content test, Dr. Levy was suspended.

29.     Before Dr. Levy returned to duty, Dr. Hendrycy alleged that Dr. Levy had subverted Pathology and Laboratory Medicine quality management programs and had repeatedly misrepresented second reviews of cases.  Dr. Hendrycy listed 76 prostate biopsy cases dating back to 2009 in which Dr. Levy had falsely indicated in the pathology reports that Dr. Hendrycy had concurred with the diagnoses.  Dr. Hendrycy recommended a 100 percent past review of Dr. Levy's cases if the Fayetteville VA "want[ed] to make sure that no veterans have been harmed by Dr. Levy's diagnoses[.]"  OIG Report, at 29.  Dr. Worley instead "expressed concern that [Dr. Hendrycy] was trying to get Dr. Levy fired."  *See* OIG Report, at 30.

30.     Dr. Hendrycy's concerns were largely ignored, and Fayetteville VA supervisors recommended that Dr. Levy's clinical privileges be reinstated.  Dr. Levy returned to his position on October 12, 2016.  A 100 percent review of his past cases was still not conducted.

31.     From October 12 to December 19, 2016, after Dr. Levy returned to the Fayetteville VA following suspension, he reviewed 494 cases, resulting in 69 level 2 and level 3 diagnostic errors (an error rate of 13.97 percent).

32.     On or around June 13, 2017, Dr. Levy reviewed Mr. Goins' pathology materials and entered an incorrect diagnosis of squamous cell carcinoma.  At the later sentencing hearing against Dr. Levy, Dr. Margie Scott testified that determining the correct diagnosis of Mr. Goins based on the materials available "was not difficult."  Sentencing Transcript, at 171:22-24.  Dr. Levy then falsified an entry in Mr. Goins' medical records by stating that his deputy pathologist, Dr. Hendrycy, concurred in the diagnosis, when in fact, Dr. Hendrycy disagreed and instead diagnosed the cells as adenocarcinoma.  *See* Sentencing Transcript, at 62:9-63:12; 171:5-10; 313:22-314:6.

33.     Dr. Scott later testified that Mr. Goins' "case had not been worked up completely," and the actions of the Fayetteville VA resulted in a nine-month delay in treatment of Mr. Goins for the cancer he actually had.  *See* Sentencing Transcript, at 172:21-172:18.  Specifically, in reliance on Dr. Levy's diagnosis, doctors at the Fayetteville VA treated Mr. Goins for a cancer which he did not have.  *See* Sentencing Transcript, p. 172:21-173:8.  In turn, this caused the cancer Mr. Goins actually had to grow and spread.

34.     On October 13, 2017, Dr. Levy again appeared to be impaired at work.  He was documented to be "drowsy, had glassy eyes, slurred his words, repeated nonsense words and phrases, and had an unsteady gait."  OIG Report, at 36.  Dr. Levy was subsequently suspended.  However, a comprehensive lookback review of Dr. Levy's past cases – to ensure that no veterans were harmed by Dr. Levy's impairment at work – was not conducted in 2017.  If one had been conducted, Mr. Goins' treatment providers might have been promptly notified and could have adjusted his medical care to provide treatment for the cancer with which Mr. Goins was actually inflicted.

35.     In 2018, Dr. Levy's privileges were permanently revoked, after Dr. Levy was arrested during duty hours in the parking lot of a post office on suspicion of driving while intoxicated.

36.     On or about March 27, 2018, Fayetteville VA modified Dr. Levy's prior diagnosis of Mr. Goins to reflect a diagnosis of adenocarcinoma.  Fayetteville VA never notified Mr. Goins of the change in diagnosis.  Mr. Goins was first made aware of the change in diagnosis when the U.S. Attorney's Office contacted him concerning Dr. Levy's sentencing hearing.

37.     Dr. Levy's misdiagnosis of Mr. Goins and the subsequent falsification of Mr. Goins' medical records resulted in at least a "nine-month delay in identifying the correct type of lung cancer that [he] had."  Sentencing Transcript, at 171:11-19.

38.     The comprehensive lookback through Dr. Levy's cases finally began in June 2018 and identified 2,440 cases evaluated by Dr. Levy during his tenure at the Fayetteville VA that contained level 2 errors and 589 cases with level 3 major diagnostic discrepancies.

39.     At all relevant times herein, Dr. Levy was an employee of the United States Department of Veterans Affairs, the Fayetteville VA, and the acts and/or omissions giving rise to these allegations occurred while Dr. Levy was acting within the course and scope of his office and employment.

40.     On August 16, 2019, Dr. Levy was indicted for twelve counts of wire fraud, twelve counts of mail fraud, two counts of making false statements related to a health matter, two counts of making false statements to a federal investigator, and three counts of involuntary manslaughter, all related to conduct occurring during Dr. Levy's course and scope of employment at the Fayetteville VA.  Particularly, Count Twenty-Eight against Dr. Levy indicted him for making a "material false, fictitious and fraudulent statement" in Mr. Goins' medical records.  *See*

Superseding Indictment, at ¶ 39, United States v. Robert Morris Levy, No. 5:19-CR-50059 (W.D. Ark. Aug. 16, 2019) [hereinafter referred to as "Superseding Indictment"] (attached hereto as **"Exhibit C"**).

41.     Count Twenty-Eight of the Superseding Indictment was ultimately dismissed pursuant to a plea agreement, but the Government represented during the sentencing hearing of Dr. Levy that Mr. Goins "did sustain harm, but he also sustained harm in that the risk that Dr. Levy placed [him] in by the misdiagnosis[,]" and that Mr. Goins was harmed by the falsification of his medical records which led "practitioners or clinicians to believe that [Dr. Levy's] diagnosis is unassailable."  Sentencing Transcript, at 313:20-314:6.

42.     On June 1, 2020, Dr. Levy pled guilty to one count of involuntary manslaughter and one count of mail fraud, for which he received a twenty-year sentence.

## JURISDICTIONAL PREREQUISITES

43.     All procedural prerequisites to filing this action have been satisfied, met, or otherwise waived, including the exhaustion of all administrative remedies under the Federal Tort Claims Act (FTCA).

44.     Mr. Goins filed a Standard Form 95 claim.  The Standard Form 95 is attached to this Complaint as **"Exhibit D"** and incorporated herein by reference.

45.     On or about January 27, 2021, Plaintiff's administrative claim for damage and injury under the FTCA was received by the U.S. Department of Veterans Affairs.

46.     Pursuant to 28 U.S.C. § 2675(a), no denial of the claim or settlement has been reached as of the date of filing this Complaint and therefore the administrative claim may be considered denied for the purpose of filing this pleading.

## COUNT I: MEDICAL MALPRACTICE

47.     Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth verbatim herein.

48.     The acts and/or omissions of the agents and/or employees of Defendant, through its agency with the Fayetteville VA, in failing to properly diagnose and/or treat Mr. Goins' adenocarcinoma constitute medical malpractice.

49.     The acts and/or omissions of the agents and/or employees of Defendant, through its agency with the Fayetteville VA, in causing Mr. Goins' injury constitute medical malpractice.

50.     Through the employees and/or agents of Fayetteville VA, Defendant was negligent, and such negligence was the proximate cause of the injuries and damages alleged by Mr. Goins in this action.

51.     In its treatment of Mr. Goins, Defendant, through its agents and/or employees, grossly failed to meet the applicable standard of care for medical providers in similar localities and under similar circumstances.

52.     Defendant and its agents and/or employees breached the duty they owed to Mr. Goins, and this negligence deviated from the standard of care required for medical providers under these circumstances.  The negligence consisted of, but is not limited to, the following:

    a.  In the hiring, retention, and supervision of Dr. Levy in light of his history of known alcohol and substance abuse while on the job;

    b.  In failing to establish sufficient facility quality management procedures to oversee physicians;

    c.  In failing to foster a culture of accountability and transparency among employees;

    d.  In failing to appropriately and adequately investigate numerous claims of employee impairment at work;

    e.  In failing to take appropriate actions to ensure quality patient care following reports in March 2014 that Dr. Levy's breath at work smelled of alcohol;

11

f.  In failing to conduct a comprehensive review of Dr. Levy's past cases upon knowledge that he presented to work smelling of alcohol;

g.  In failing to take appropriate actions to ensure quality patient care following staff reports that Dr. Levy had an odor of alcohol, red, glassy eyes, and hand tremors while reviewing biopsy slides;

h.  In disregarding staff allegations claiming that Dr. Levy subverted quality management programs, repeatedly misrepresented concurrences in case reviews, and was deficient in communication with providers following changed diagnoses;

i.  In failing to take appropriate investigative actions, including repeated failures to administer blood alcohol tests or urine drug screens, to which Dr. Levy consented, after Dr. Levy appeared to be impaired at work;

j.  In failing to take appropriate disciplinary and/or enforcement actions in response to blatant employee violations of VHA policies;

k.  In failing to adequately supervise employees with known substance abuse issues whose potential impairment could foreseeably cause substantial harm to patients;

l.  In failing to conduct an adequate and comprehensive review of Dr. Levy's prior case work following the verification by blood alcohol content testing that Dr. Levy was performing his duties at the Fayetteville VA while heavily under the influence of alcohol;

m.  In reinstating Dr. Levy's privileges after Dr. Levy registered a blood alcohol content of 397.6 mg/dL while performing work as a pathologist for Defendant;

n.  In violating VHA policies by repeatedly accepting and relying upon non-pathologist peer references to support Dr. Levy's re-privileging after confirmation of his impairment at work;

o.  In failing to establish adequate measures to determine and/or evaluate accurate error rates in medical diagnoses by employees;

p.  In failing to protect patients, including Mr. Goins, from harm;

q.  In failing to properly diagnose Mr. Goins;

r.  In failing to properly review and follow up on the diagnosis assigned to Mr. Goins;

12

s.   In falsifying medical records relating to Mr. Goins' diagnosis;

t.   In failing to promptly notify Mr. Goins of the review and substantial modification of the diagnosis assigned to him by Defendant;

u.   In failing to have in place adequate policies, procedures, and oversight to ensure that patients, including Mr. Goins, receive adequate care from sober, competent employees;

v.   In hindering proper review of the diagnoses assigned to Mr. Goins;

w.   In failing to take reasonable steps to identify errors in Mr. Goins' diagnosis and notify Mr. Goins of errors identified;

x.   In failing to create, implement, follow, and enforce reasonable policies and procedures to prevent the falsification of Fayetteville VA patients' medical records;

y.   In failing to institute additional safeguards to ensure the validity of pathology diagnoses following actual knowledge that Dr. Levy falsified records to indicate a concurrence of diagnosis when such information was knowingly false; and

z.   In other particulars as the evidence might show.

53.   In rendering medical services, examinations, treatments, diagnoses and medical care for Mr. Goins, the Defendant failed to exercise the degree of skill and care that would be expected of an ordinarily prudent and competent healthcare provider under similar circumstances.

54.   Further, the U.S. Department of Veterans' Affairs, including the Fayetteville VA, incentivized medical personnel, including Dr. Levy, to report a clinical error rate of less than five percent in exchange for monetary performance bonuses.  Defendants failed to put in place adequate measures to ensure that the error rates reported by medical personnel were accurate.  Dr. Levy repeatedly reported to the Fayetteville VA that his error rate was below five percent – reporting during some years that he had a zero percent error rate – to receive such bonuses.  In reality, Dr. Levy's error rate at the Fayetteville VA was 9.98 percent.  This error rate included at least 586 level 3 misdiagnoses.  Dr. Levy was noted as an individual "who took shortcuts, who did not work

up cases completely, who did not submit as many tissue sections from large major surgical cases that [he] should have, who did not follow through with the appropriate workup." Sentencing Transcript, at 137:4-23. Despite this, Dr. Levy received twenty-five percent of his performance bonus for reporting an error rate of less than five percent, largely due to the Fayetteville VA's failure to establish adequate safeguards that could ensure the validity of the reported error rate and its failure to properly review Dr. Levy's self-reported error rates.

55.     As a result of Defendant's systemic failures, Dr. Levy was able to "create[] [his] own rules in how [he] w[as] going to operate and perform [his] duties as a pathologist" at the Fayetteville VA. Sentencing Transcript, at 137:15-23. Ultimately, during Dr. Levy's time at the Fayetteville VA, his "cases were not worked up completely. Diagnoses were rendered on insufficient information. And some of the errors [we]re just astounding that anybody would look at a slide and even consider the diagnosis that was put into the medical record." Sentencing Transcript, at 137:24-138:3.

56.     Even if the Defendant never discovered that Dr. Levy was intoxicated while practicing medicine, the errors that were brought to the Defendant's attention by the Fayetteville VA's deputy pathologist, Dr. Hendrycy, were enough that the Defendant knew or should have known a major problem existed at the Fayetteville VA regarding the medical care that was being rendered due to the assignment of blatant misdiagnoses, systemic deficiencies in the pathology department, and insufficient quality management programs.

57.     Each of these negligent acts and/or omissions by Defendant, singularly and/or in combination, proximately caused the injuries of Mr. Goins.

58.     As a result of Defendant's failure, and through its agents and/or employees in rendering medical services, examinations, treatments, and diagnoses, Mr. Goins suffered severe injury and tremendous suffering.

59.     As a direct and proximate result of Defendant's negligence:

   a.   Wayne Goins was required to seek and obtain additional medical treatment, incurring substantial medical expenses as a result thereof.

   b.   Wayne Goins' enjoyment of life was impaired, and his life span was likely shortened.

   c.   Wayne Goins did not receive appropriate care for and/or treatment and sustained serious injuries as a result.

   d.   Wayne Goins suffered great pain and mental anguish as a direct result of the aforementioned injuries.

60.     Mr. Goins suffered significant mental anguish and emotional distress as a result of the Fayetteville VA's actions.  Moreover, his mental anguish and emotional distress has been exacerbated and aggravated by the recent discovery that the Fayetteville VA had numerous opportunities prior to treating Mr. Goins to prevent Dr. Levy from practicing medicine while impaired, to remove Dr. Levy from service following actual knowledge of impairment while on the job, and to ultimately prevent Mr. Goins' injuries.  Finally, Mr. Goins' pain and suffering has been significantly exacerbated by the Fayetteville VA's unconscionable and repeated failures to protect patients from substantial harm, and in creating, maintaining, and tolerating a healthcare system where a chronically impaired doctor could cause devasting consequences to hundreds of veterans without review, without reprise, and for over a decade at the Fayetteville VA, without consequence.

## COUNT II:  OUTRAGE

61.     Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth verbatim herein.

62.     The actions of Dr. Levy alleged herein constitute willful and wanton conduct that was so extreme and outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.  Dr. Levy's outrageous actions include, but are not limited to, the following:

   a. Providing medical treatment to Mr. Goins and other veterans while under the influence of alcohol and/or other drugs;

   b. Consciously compromising patient care and jeopardizing patient's lives by analyzing and diagnosing patients while under the influence of alcohol and/or other drugs that knowingly and recklessly increased the likelihood of serious and deadly medical errors;

   c. Subverting and preventing comprehensive reviews of past cases to hide his knowing and reckless actions and medical errors committed as a result of same;

   d. Lying to superiors, colleagues, and subordinates about his alcohol and drug dependency and chronic intoxication while on the job;

   e. Subverting quality management programs, repeatedly misrepresenting concurrences in case reviews, and failing to communicate changed diagnoses to providers;

   f. Hindering proper review of the diagnoses assigned to Mr. Goins;

   g. Intentionally falsifying medical records relating to Mr. Goins' diagnosis rather than exposing his reckless medical errors;

   h. Failing to promptly notify Mr. Goins of the review and substantial modification of his cancer diagnosis despite the likely and foreseeable harm to Mr. Goins as a result of his incorrect, original diagnosis; and

   i. In such other particulars as the evidence might show.

63.     Dr. Levy knew or should have known, in light of the surrounding circumstances, that his outrageous actions alleged herein would naturally and probably result in emotional distress

and/or bodily harm to Mr. Goins, and yet Dr. Levy continued his outrageous actions in reckless disregard of the consequences.

64.     Dr. Levy's outrageous actions alleged herein were committed during the course and scope of his employment with the Defendant, and, in fact, Defendant knew or should have known about Dr. Levy's outrageous actions and the likelihood that he would continue to act in such an outrageous manner to the detriment of his patients, including, but not limited to, Mr. Goins. Despite the Defendant's actual and/or constructive knowledge, it did nothing to prevent Dr. Levy's outrageous conduct, expose the extent of the harm caused by Dr. Levy's conduct, or to rectify the harm caused until Dr. Levy was arrested on suspicion of driving while intoxicated in 2018.

65.     As a direct and proximate result of Dr. Levy's outrageous actions, which are properly imputed to the Defendant under the doctrines of *respondeat superior* and/or agency, Mr. Goins has suffered emotional distress to such a severe degree that no reasonable person could be expected to endure it, and has further suffered bodily harm, including, but not limited to, the following:

      a.   Inappropriate medical care and bodily injury endured as a result of same;

      b.   Additional medical treatment and substantial medical expenses;

      c.   Loss of enjoyment of life and a shortened life span; and

      d.   Great pain, suffering, and mental anguish experienced as a result of the aforementioned injuries.

WHEREFORE, Plaintiff prays that the Defendant be ordered to appear and answer the Complaint herein; that upon final trial of this action Plaintiff be granted judgment against Defendant for his damages in an amount in excess of that required for jurisdiction for compensation of medical expenses and conscious pain and suffering both physical and mental, and any other relief to which this Court, in its discretion, may find it to be justly entitled.

17

Respectfully submitted,

WAYNE GOINS, PLAINTIFF

By:   */s/ Monte Sharits*
       Monte Sharits, Ark. Bar No. 10137
       Alan L. Lane, Ark. Bar No. 2003131
       Matthew L. Lindsay Ark. Bar No 2004028
       Hannah L. Hungate, Ark. Bar No. 2021161
       Bryant E. Crooks, Ark. Bar No. 2013169
       ODOM LAW FIRM, P.A.
       161 W. Van Asche Loop, Suite 1
       Fayetteville, AR 72703
       (479) 442-7575
       (479) 442-9008 *fax*
       msharits@odomfirm.com
       alane@odomfirm.com
       mlindsay@odomfirm.com
       hhungate@odomfirm.com
       bcrooks@odomfirm.com

       ATTORNEYS FOR PLAINTIFF